UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH J. MELCHER,

        Petitioner,

    v.

KIM HOLLAND, Warden,

        Respondent.

Case No. 12-0544 WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

Petitioner Joseph Melcher, a California prisoner, filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his conviction in state court. Respondent was ordered to show cause why the writ should not be granted on the due process claims based on: (1) the trial court improperly denied Melcher's motion for severance; (2) the trial court improperly admitted expert testimony on toolmark and firearm identification; (3) the trial court improperly admitted irrelevant and prejudicial character evidence; (4) the trial court improperly admitted evidence that firearms evidence was given to a defense expert; (5) the trial court failed to institute competency proceedings; (6) the trial court improperly allowed Melcher to waive an insanity plea and (7) the cumulative effect of these errors. Respondent filed an answer with a supporting memorandum of points and authorities. Petitioner has filed a traverse. For the reasons set forth below, the petition is DENIED.

## STATEMENT OF THE CASE

### I.    Procedural Background

On May 13, 2009, a San Francisco County Superior Court jury found Melcher guilty of: three counts of murder; two counts of first degree attempted murder; discharge of

a firearm at an occupied vehicle; two counts of assault with a semi-automatic firearm; and reckless driving while evading a peace officer.  The jury also found true the special allegations of: (1) multiple murder special circumstance; and (2) personal discharge of a firearm causing great bodily injury and death.  The jury did not find true the allegation that the crimes were committed because of the victims' race.  On June 11, 2009, the trial court sentenced Melcher to 200 years to life in prison plus life without the possibility of parole.

On September 23, 2011, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  Ex. 7.  On December 14, 2011, the California Supreme Court denied review.  Ex. 9.  This federal habeas petition followed.

## II.    Factual Background

The Court of Appeal summarized the facts of the case as follows:

### A. San Bruno Avenue Incidents

Around 2:30 a.m. on August 27, 2006, Robert Stanford, Dominic Cheng and Tony Ma left the home of their friend Latesha Li, located on the 2600 block of San Bruno Avenue in San Francisco.  This section of San Bruno Avenue is dotted with businesses with Asian characters depicted in their signage.  Stanford and Cheng got into Stanford's car and Stanford made a U-turn.  Ma saw a burgundy reddish car pull in front of Stanford's car.  According to Ma, a White or Hispanic man, five feet 10 or five feet 11 inches tall, 140–150 pounds, bald with a hoodie got out of the car with a gun, walked to Stanford's car and fired eight or nine shots at him.  The shooter then drove off.  Cheng got out of the car, injured and bleeding; a bullet was removed from his leg.  Stanford died of multiple gunshot wounds.

Cheng described the shooter as average size with light skin, round eyes, a shaved head, and wearing a hoodie.  FN2  The car was a red, hatchback-type car.

> FN2  In November 2006 Cheng viewed a photograph array, but he was unable to make a positive identification of appellant.  He pointed to two persons other than appellant as, respectively, looking most like the shooter, or maybe the shooter.  He also viewed a video clip of the subsequent Japantown shootings.  He said the Japantown suspect "looked a little big" and a "little buffer."  He told the officers that he "knew it probably wasn't him because he could, like, not get buffed and stuff that fast."  But the bald head and skin tone were similar to the person who shot Stanford.

A police inspector retrieved 10 Federal .45–caliber cartridge casings from the San Bruno Avenue scene.

### B. Japantown Incidents

Nearly two months later, around 9:00 p.m. on October 21, 2006, bartender Mi Qyung Kim was working at The Flow bar in Japantown.  Song Lee and Jung Lee were chatting at the bar.  A White man in his 20's, five feet 10 inches tall, no facial

United States District Court
Northern District of California

hair, wearing a white cap and a white hooded sweater shirt, walked into the bar.

He asked Jung Lee in Korean, "[W]here is Jennifer?" Song Lee asked, "Why are you asking?" The man pulled out a black gun and shot Song Lee, using his right hand. Mi Qyung Kim scooted behind the bar. The man aimed the gun at her and shot; she fainted.

Around that time, Chak Ting Tsui was walking in Japantown with her boyfriend Stephen (Kam Li). A White man wearing a white hooded jacket or coat was coming from Denny's, a restaurant located above The Flow bar on Post Street. He was yelling loudly and swearing. The man was around 20 to 30 years old, about five feet 10 inches tall with no facial hair, and an average build. He came toward the couple, saying "I'm talking to you." He said "Fuck you," pulled out a black gun and shot Stephen in the back of the head, using his right hand.

Also around 9:00 that evening, Jeffrey Tai was walking with Jimmy Yu and other friends in Japantown toward an intersection between Post and Buchanan. Yu heard two shots coming from a basement. About two minutes later, a man ran next to the group, coming from the direction of the basement; he mumbled something. The man ran across the street while the light was still red, said "Fuck you, motherfucker" to a man, pulled out a gun and shot him.

Tai recalled the shooter as Caucasian, in his late 20's, wearing a baseball cap, a white jacket and jeans; he was about six feet tall. Yu described him as Caucasian, five feet 10 inches tall, wearing a baseball cap, white sweatshirt and jeans. He did not have any facial hair.

Kevin Hibbitt and Alissa Di Franco were also in Japantown when they heard a shooting in the plaza. Hibbitt saw the victim fall down. He heard a man yelling, "You don't fuck with Johnny boy whitey, San Francisco coke dealer." Di Franco started to call 911. The man looked at her and said, "Yeah, that's right, lady, call on the phone. Call the cops. Tell them someone has been shot." Di Franco heard him say, "White girl, don't fuck with me. Go ahead. Call emergency. San Francisco coke dealer." The shooter was walking backward, gesturing side to side at waist level, going toward Geary Street.

Di Franco said the perpetrator had very pale skin and very dark eyes. He was between five feet seven inches and five feet 11 inches tall, medium build, wearing a white sweatshirt or jacket with a hood. She also thought the jacket had blue stripes down the sleeves. Hibbitt stated the man was of medium height, Caucasian with very pale skin, and wearing a white sweatshirt or jacket with some covering on his head, either a white baseball hat or white hood. He had no facial hair and was medium to stocky build.

Juliana Boehmer also witnessed the shooting. She was walking in front of Katsumo Mall in Peace Plaza when she heard more than five firecrackers or gunshots. Soon thereafter she saw a man coming up the stairs to ground level from the downstairs bar. He was wearing a white sweatshirt and dark pants, about average height, medium weight. The man was saying something to himself. He cussed, asked a man, "What are you looking at?" and then shot him.

Walking in Japantown that night, Shmuel Krampf heard someone say "motherfucker"; he turned around and saw a flicker of fire between two people. Krampf heard a "puff" sound and saw someone fall down. People were running away. One man wearing a white sweatshirt and white baseball-type hat turned around and started walking away slowly, looking around him. He was "30 up,"

3

slightly taller than Krampf who was five feet eight inches tall, with a medium build. Krampf called 911.

The police arrived at the Japantown scene.  Officer Danny Miller came upon Kam Li, who was lying on the ground with a gunshot wound to the head.  FN3  A woman came out of The Flow bar, screaming, "[H]e is in there shooting people."  Inside the bar, Song Lee was on the ground, lying in a pool of blood; there was a lot of brain tissue and matter splattered.  FN4  Kim was propped up behind the bar, moaning and bleeding.

> FN3   Li died as a result of the gunshot wound to his head.

> FN4   She died of multiple gunshot wounds, including two to her head.

Inspectors Jimmie Lew, John Tursi and Daniel Cunningham were in an unmarked vehicle wearing raid jackets with "[P]olice" on the back when they received a dispatch call at 9:16 p.m. alerting them to a Japantown shooting.  Dispatch described a White male, in white clothing with a white baseball cap.  At the intersection of Webster and O'Farrell, two blocks from Japantown, they spotted a White male, wearing white clothing and a white cap with black striping.  The man went into the Safeway parking lot, got into a white four-door Ford Focus and drove away.  Inspector Tursi saw the man, whom he identified in court as appellant, holding a dark handgun pointed toward the car ceiling.  Inspector Lew pointed his weapon at appellant, and he and Cunningham yelled, "Police."  Appellant drove in front of the police vehicle, looked in the officers' direction and continued on.  Cunningham broadcast the license plate and description of the vehicle; he and Lew followed appellant.

Meanwhile, Officer Steven Pomatto and his partner, in uniform and a marked vehicle, responded to a call of a possible suspect getting into a white vehicle in the Safeway parking lot.  Appellant drove toward Officer Pomatto, who got out of his vehicle, drew his firearm, made eye contact and yelled to stop.  The vehicle accelerated southbound onto Fillmore Street.

Inspectors Lew and Cunningham gave chase.  Appellant ran stop signs and red lights, traveling at a high rate of speed, recklessly.  Other officers, in a marked patrol car with lights and siren, eventually took the lead.

Appellant suddenly stopped between Webster and Fillmore Streets, and surrendered.  As he was arrested, appellant repeated, "I'll never go to jail for this." He had a glazed look in his eye, and "strutted" his chest out.  There was blood on appellant's jacket and sleeve, as well as bloodstains on his left shoe and jeans.

An officer processed appellant's hands for gunshot residue; another officer recovered a semiautomatic Glock handgun and magazine from the floorboard of the white Ford.  The weapon smelled of gun powder that had recently burned.  At trial the parties stipulated that appellant purchased the .45–caliber semiautomatic Glock pistol from L.A. Guns in Los Angeles, taking possession of it on August 22, 2006. Police also found a Dell laptop in the car.

Later that evening Chak Tsui viewed appellant in an orange jumpsuit, at the police station.  She told the inspector, "I don't know" but added "that he looked very much like him."  She wrote for the record, "The one that I saw in police station is very looked alike to the guy who shot my boyfriend, but I am not . . . 100 percent sure." Hibbitt and Di Franco also saw appellant at the police station.  Hibbitt was 60 percent certain that he was the person he saw at the scene, and noted appellant fit

4

the general description: White male, medium build, very pale skin, no facial hair. Di Franco said she recognized appellant's skin tone and eyes as that of the person in the plaza.

Kim was shown a six-photograph lineup in the hospital. She pointed to appellant's photograph, noting, "Maybe number 4 but not sure." Kim was in the hospital for six days, undergoing surgery, including placing a metal rod into her left leg to stabilize the shattered femur. Her left leg is now shorter than the right leg and she still has trouble walking up stairs, and up and down hill.

## C. Investigation

Crime scene investigator Rolan Shouldice recovered one .45–caliber Federal casing on Post Street near bloody clothing; and from The Flow bar nine Federal casings, two expended bullets, two copper jacket fragments and one lead fragment.

Samples taken from both of appellant's hands tested positive for gunshot residue. The presence of gunshot residue on a person's hands indicates that the person fired a gun, was in close proximity when a gun was fired, or came in contact with an object that had gunshot residue on it.

Inspector Michael Johnson searched appellant's home in Panorama City, Los Angeles. He retrieved an Enterprise rental car receipt for a red, four-door Chevrolet Cobalt (not a hatchback). The car was rented on August 12, 2006, and returned September 27, 2006. Johnson also found a parking ticket from the San Francisco Department of Transportation dated August 5, 2006. Also recovered was a case for a Glock. Finally, Johnson found some small cards with Asian characters on the front and the statement "A fatal attraction to Cuteness" on the back. There were no documents or paperwork located in appellant's home indicating any animosity toward Asians.

Officer Joseph Lynch, a computer forensics expert, conducted a search of appellant's computer, looking for "hate crime type of documentation." Using keywords including "Asian," "kill," "hate" and "Jennifer," he came upon the "rotten.com" Web site accessed many times on appellant's computer, including on September 5 and 9 and October 4, 8, 10 and 14, 2006. Lynch described the Web site as containing graphic images of crime scenes, pictures related to racism, and morbid images. In appellant's folder, accessed on October 14, 2006, was an animated cartoon of a female cut up as sushi. Another image, accessed on October 6, 2006, was of an animated Asian female lying on a bed, partially clothed. Other images accessed included Asian persons wearing protective masks over their faces, Asian military pictures, and sexually explicit animated cartoons.

## D. Expert Testimony

Gerald Smith, a criminalist assigned to the firearm and toolmark unit of the San Francisco Police Department Crime Laboratory, is a firearms examiner and expert on firearms identification. He is certified in firearms and toolmark identification through the Association of Firearm and Toolmark Examiners. He testified that the .45–caliber semiautomatic Glock with a 10–cartridge magazine was in "very good condition" and "functioned properly." . . .

Smith examined the 10 cartridge casings and spent bullets from the Japantown shootings, concluding that the bullets were right-hand twists with eight lands and grooves, consistent with the polygonal rifling of a .45–caliber Glock pistol.

Smith compared five casings he had test-fired from the seized weapon with the 10 casings that were fired during the Japantown incidents, looking for individual characteristics that are imparted on the firearm. The tooling in the manufacturing of the firearm causes random imperfections detectable on a microscopic level that are individual to each gun "and in and of themselves." Using side-by-side microscopic comparisons, Smith determined there were sufficient individual characteristics to conclude that the 10 cartridge casings were fired by the recovered Glock. He gave his opinion that "[t]he agreement that I am seeing on an individual level is sufficient enough for me to say that the chances of another firearm creating that exact same pattern are so remote to be considered practically impossible." The comparisons were "textbook," "very good examples of what it should look like when one firearm is identified to an exhibit." FN5

> FN5   On the other hand, although Smith determined that the two bullets retrieved from the Japantown shootings came from a .45–caliber automatic weapon, . . .he could not eliminate or identify them as coming from appellant's Glock. . . .

Smith also compared the test fire casings with a casing located at the site of the San Bruno shootings, concentrating on the aperture shearing. He concluded that the casing was fired by the Glock pistol recovered from appellant's car in Japantown.

Smith testified that there were many studies published over the years dealing with the individuality of gun barrels. And many studies have validated that each gun leaves individual markings. Conversely, there is no study that states two different guns left the exact same individual marks. In one recent study, a Glock pistol fired over 10,000 rounds and the first test fire still matched the 10,000th test fire, demonstrating that "many, many firings" would have to occur before there would be a change that you could not identify back to the gun.

Smith indicated that his opinions were subjective, based on his training, experience and exposure to firearms identification over the past 10 years. And, according to the lab standards for identification of firearms, the concept of "sufficient correspondence" is not numerically defined. Again, it is a subjective determination left to the examiner.

On cross-examination, Smith acknowledged that the February 2009 National Research Council (NRC)  FN6  report entitled Strengthening Forensic Science in the United States: A Path Forward, undertaken by congressional mandate, concluded that additional studies should be conducted to "make the process of individualization more precise and reputable." Smith indicated his agreement with that particular conclusion. However, he disagreed with the NRC's assessment that "[b]ecause not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and reputability of the methods." Smith also acknowledged that he did not measure the length, width or depth of the lines of marks because when looking through the comparison microscope, he could visually make the comparison. Nor did he count the number of matching lines. Further, he did not use three-dimensional surface measurements as suggested in another recent federal report.

> FN6   The NRC is under the umbrella of the National Academy of Sciences.

The parties stipulated that the San Francisco Police Department released the ballistics evidence to the defense expert.

6

Criminalist Cherisse Boland, an expert in DNA analysis, testified that the blood on appellant's jeans and sweatshirt matched the DNA profile of Song Lee, and a mixture of DNA on his T-shirt and left shoe matched appellant's and Lee's profiles.

Investigator Shouldice, an expert in crime scene reconstruction, gave his opinion that the three linear lines of Song Lee's blood on appellant's sweatshirt had been transferred when appellant came in contact with the straight edge of the bar. As for the highly concentrated amount of her blood on appellant's sleeve, Shouldice opined that the sleeve would have to come in contact with a heavy concentration of blood, the most likely contact points being the bar area or the victim herself. The satellite spatters of her blood on appellant's left tennis shoe and the absence of blood on the shoe bottoms required a close proximity to the source of blood dripping into blood (not blowback spatter from a shooting). Shouldice deduced the shooter was to the right of Lee, standing on the bar, meaning his left shoe would be closest to where the blood was dripping (Lee being seated on a bar stool). There was no blowback stain on appellant's sweatshirt. The shooting of a person does not always produce blowback.

Defense: Appellant testified on his behalf. He lived in Panorama City and had family in Southern California as well as in the Bay Area. He did not recall being in the Bay Area during the week of August 22, 2006; he was probably doing something in Los Angeles. The day before his arrest, he had driven to his grandmother's house in San Mateo for her birthday.

On October 21, 2006, he struck up a conversation with a man named Charon and two women at a bar on Union Street in San Francisco. Charon was Asian or Latin–American, wearing a white hooded sweatshirt, light-colored jeans and a black, white and gray camouflaged Giants cap. Charon was a "bit shorter" than appellant, had a round face, tight eyes, and skin that was a "little bit" darker complected than his own. If he had hair, it was very short and black. The four of them went to the Bus Stop bar and also had drinks.

The subject of medical marijuana came up; appellant has a medical marijuana card. Charon wanted to smoke some marijuana but it was between 7:30 and 8:00 p.m., and most of the cannabis clubs would be closed at that time. Appellant and Charon went to appellant's car; there, Charon called someone to confirm that he could get some marijuana. Charon smoked a little marijuana in the car, and when he pulled out a cigarette pack, appellant saw a firearm in his waistband. Appellant asked to see the weapon, which he described as a .45–caliber semiautomatic gun, unknown make. Appellant then showed Charon his unloaded Glock, which he planned on shooting at a range that night. Appellant put the gun back in a pouch underneath the driver's seat.

Charon directed appellant to Japantown, to a bar below Denny's where he could get the marijuana. Appellant parked in the Safeway parking lot and Charon got out of the car. Appellant waited 35–45 minutes and when Charon did not return, appellant went looking for him on foot. He went down a stairwell into the bar as Charon had described. He walked to within inches of a woman's body on the floor, initially thinking it looked fake. Looking over the bar because he did not see a bartender, he saw another body.

Appellant did not call 911 because he panicked and ran out of the bar to his car, never crossing Peace Plaza. Pulling out, he saw a "regular car" behind him with a middle-aged man in regular clothes, brandishing a firearm. He was "still in panic" and thought he should get as far away as possible. As he left the parking lot, he

United States District Court
Northern District of California

noticed what appeared to be his pistol, and grabbed it; he saw "the police" while he still had the gun in his hand, so he ducked and put the gun under the seat. Appellant ran a couple lights, eventually saw a marked police car and pulled over.

Appellant denied killing or shooting any of the victims. He did not know anyone named Jennifer, and did not speak Korean. Initially he denied coming to San Francisco in August 2006, but then acknowledged that the August 5, 2006 San Francisco parking ticket with his name and address on it was his. He also conceded that he had accessed the rotten.com Web site and that it contained images of horrific deaths, crime scenes, and people with heads smashed in. The prosecutor asked if there were any racist pictures at the Web site, but withdrew the question upon defense objection.

Appellant admitted he had not yet met Charon on August 27, 2006, when Stanford was killed.

Appellant reported that he was five feet 10–1/2 inches tall, weighing between 150 and 160 pounds.

Appellant said he did not lock the passenger side of his car when he left to look for Charon, even though he thought his Glock was in the car. He wanted to make it convenient for Charon to sit in the car if he returned when appellant was not present.

(Ex. 7 at 2-12.)

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13

(2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion from the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). The last reasoned state court decision on Melcher's claims is the decision by the California Court of Appeal on direct review. (Ex. 7.)

## DISCUSSION

## I.   Severance

Melcher's trial counsel sought to sever the San Bruno counts from the Japantown counts. The trial court denied the severance motion. Melcher argues that the joinder of the counts was prejudicial because of the inflammatory nature of both the incidents, in particular the Japantown incident.

### A. Court of Appeal Opinion

The Court of Appeal denied this claim, first noting that the trial court instructed the jury with CALCRIM No. 3515, which states, "Each count charged in this case is a separate

9

crime, you must consider each count separately and return a separate verdict for each one."

(Ex. 7 at 12).

The Court of Appeal reasoned as follows:

Penal Code  FN8  section 954 permits the joinder of offenses of the same class of crimes, under separate counts.  However, the trial court retains discretion, "in the interests of justice and for good cause shown," to sever statutorily joinable offenses. (*Ibid.*)  This provision recognizes that severance may be necessary to satisfy due process and fair trial guarantees.  (*People v. Bean* (1988) 46 Cal. 3d 919, 935.)

> FN8   All further statutory references are to the Penal Code unless otherwise specified.

"Where the statutory requirements for joinder are met, the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion." (*People v. Lynch*, 50 (2010) Cal. 4th 693, 735.)  The denial of a motion for severance amounts to a prejudicial abuse of discretion only if the lower court's ruling lies outside the bounds of reason.  (*Alcala v. Superior Court* (2008) 43 Cal. 4th 1205, 1220.)

. . . There are criteria to guide our evaluation of the denial of a severance motion. The pertinent factors are whether (1) the evidence would be cross-admissible in independent trials; (2) certain charges are unusually likely to inflame jurors against the defendant; (3) a weak case is joined with a strong case or another weak case, such that the aggregate evidence might unfairly alter the outcome on some or all charges; and (4) one charge is a capital offense, or joinder of the charges would convert the matter into a capital case. (*People v. Lynch*, 50 Cal. 4th at 736.)  Where evidence underlying the offenses at issue would be cross-admissible in independent trials of other charges, that factor normally is sufficient, by itself, to dispel any prejudice and validate the trial court's refusal to sever the charged offenses. (*People v. Soper*, (2009) 45 Cal. 4th 759, 774–775.)

We note, too, that a jury can consider properly admitted evidence of other crimes if it finds, by a preponderance of evidence, that the defendant committed the other crimes. (*People v. Lynch*, 50 Cal. 4th at 736.)  Here, there was a preponderance of evidence that appellant was the perpetrator who committed each crime.  He purchased the gun that he used to kill or attempt to kill all the victims, and was found in possession of the gun minutes after the Japantown homicides.  Further, appellant fit the description of the killer in each case and was connected to both getaway vehicles.

Appellant urges that reversal and remand for a fair trial is required, citing, among other authority, *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073. . . .

None of the *Bean* concerns are present here.  First, and most importantly, there is cross-admissible evidence.  Evidence of appellant's intent would be cross-admissible in separate trials.  . . . The factual similarities among the crimes may tend to show that in each case the perpetrator harbored the same intent. . . ., the similarities here demonstrated that in both the San Bruno and Japantown instances, appellant harbored the intent to kill and premeditated the homicides.  In each case he committed an entirely unprovoked attack on Asian victims unknown to him, whom he shot with the gun he recently purchased, after renting a car which he used to escape the crime scenes.

United States District Court
Northern District of California

The weapon and casings evidence likewise was cross-admissible—had the San Bruno and Japantown charges been severed, such evidence would have been admitted in both cases. The cartridges at each scene came from the same gun, which appellant purchased weeks before the San Bruno shootings. The magazine of that gun held 10 cartridges, and 10 cartridges were found at each scene. Further, the gun was retrieved from appellant, smelling of gun powder, right after the Japantown shootings. All this was circumstantial evidence that appellant was the shooter in both crimes. . . . Additionally, the court delivered proper instructions that each count charged was a separate crime, and the jurors had the duty to consider each count separately, and return separate verdicts for each count.

Second, joinder did not result in tying an inflammatory charge with a noninflammatory charge. While the Japantown crime spree resulted in two murders and an attempted murder, as compared with the single murder and attempt in the San Bruno location, both sets of crimes were shocking, unprovoked and similar in nature. Thus neither set of charges was unusually likely to inflame the jury against appellant.

Third, we are not confronted with a weak case joined with a strong case such that the total evidence could unfairly alter the outcome on some or all charges. Again, although there was more evidence in the Japantown case, including victim DNA found on appellant's clothing, the San Bruno case was not weak. The shooter left 10 cartridges at the scene from the same .45–caliber weapon which appellant purchased and possessed. As well, witnesses described the killer with similar details in both cases and getaway cars were tied to appellant at both scenes. The victims targeted each time were Asians, and the attacks were always unprovoked.

Finally, the cases were not charged as capital cases.

[J]oinder of the causes did not result in a violation of appellant's constitutional rights. The case was not a capital case, and the People presented valid reasons for opposing severance. Intent evidence and the matching gun and casing evidence were cross-admissible, thus dispelling any possibility of prejudice. Nor was there a great disparity in evidence between the cases. Indeed, both were strong cases, notwithstanding that there was more evidence in the Japantown cases.

(Ex. 7 at 12-15.)

**B. Federal Authority**

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. *Id.* Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. *Id.* To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. *Id.* In addition, the

11

1  impermissible joinder must have had a substantial and injurious effect or influence in

2  determining the jury's verdict.  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

3  In evaluating prejudice, the focus is particularly on the cross-admissibility of evidence and

4  the danger of a "spillover effect" from one charge to another, especially where one charge

5  or set of charges is weaker than the other.  *Id.*; *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th

6  Cir. 1998).

7      **C. Analysis**

8      The Court of Appeal's denial of this claim was not objectively unreasonable.  First,

9  as noted by the Court of Appeal, much of the evidence was cross-admissible.  For instance,

10  in both the San Bruno and Japantown incidents Melcher committed unprovoked attacks on

11  Asian victims who were unknown to him, Melcher shot all of the victims with the same

12  gun that he had recently purchased and Melcher escaped in a car that he had recently

13  rented.  These similar facts showed that Melcher had the same intent in both incidents—

14  the intent to kill and premeditation.  As noted by the state court, evidence of Melcher's

15  intent would be admissible in both trials.  Further, the evidence of the weapon and casings

16  was cross-admissible--the cartridges at each scene came from the same gun and the

17  magazine of that gun were found at each crime scene.  The gun itself was retrieved from

18  Melcher, smelling of gunpowder, immediately after the Japantown shootings.  The gun

19  itself would be admissible at each trial.

20      Second, the facts in both cases were similar such that neither case was likely to

21  unduly inflame the jury against Melcher.  Although there were two murders and one

22  attempted murder in Japantown and one murder and one attempted murder in San Bruno,

23  both incidents involved Melcher's unprovoked shooting at unsuspecting citizens who

24  appeared to be Asian.

25      Third, both cases were strong.  Although, as noted by the Court of Appeal, more

26  evidence supported the prosecutor's Japantown case, such as the victim's DNA on

27  Melcher's clothing, the San Bruno case was not weak.  In both cases, Melcher left ten

28  cartridges at the scene from the same .45 caliber gun that he purchased and possessed, the

United States District Court
Northern District of California

witnesses in both incidents described the killer similarly, matching Melcher's description, and, in both cases, the getaway cars were tied to Melcher.

Therefore, Melcher was not denied his right to a fair trial because his cases were joined. And, even if constitutional error occurred, it did not have a substantial or injurious effect or influence on the jury's verdict because the evidence against Melcher was overwhelming in both cases. The following evidence supported the verdict in regard to the Japantown shootings: (1) immediately after the shootings, witnesses saw Melcher with a gun fleeing from the scene; (2) the police had constant visual contact with Melcher after the shootings and followed him in his car, until they arrested him in possession of a gun, which they determined had recently been fired; and (3) when Melcher was arrested, he had Song Li's blood on his clothing and gunshot residue on his hands. The following evidence supported the verdict in regard to the San Bruno shootings: (1) the witnesses' description of the shooter matched Melcher's appearance; (2) the crime was similar in execution to the Japantown shootings; (3) the gun that was used to shoot the victims was the one possessed by Melcher; and (4) the getaway car was recently rented by Melcher.

Furthermore, any danger of prejudice was alleviated by CALCRIM no. 3515, which instructed the jury that each count charged was a separate crime, that each count must be considered separately and that a separate verdict must be returned for each count. It is presumed that the jury followed the instructions it was given. *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 840 (2009).

Based on the foregoing, even if an error occurred, it did not have a substantial or injurious effect or influence on the jury's verdict. Therefore, habeas relief on this claim is denied.

## II.    Expert Testimony on Toolmark and Firearm Identification

### A. Admission of Testimony without *Kelly* Prong-One Hearing

Melcher argues that the trial court erred by admitting the expert testimony of Gerald Smith regarding his identification of the firearm and toolmark evidence, which should not have been admitted without a foundational hearing pursuant to *People v. Kelly*, 17 Cal. 3d

24 (1976).  Melcher also argues that the trial court erred by admitting the expert's testimony about the certainty of the evidence.

### 1. Court of Appeal Opinion

The Court of Appeal denied this claim as follows:

**Procedural Background**

Prior to trial, defense counsel moved to exclude the firearm and toolmark identification evidence.  Counsel asserted that the continuing general acceptance of such evidence, including assertions as to the degree of certainty or impossibility of another weapon being the weapon that fired the lethal or wounding bullets, was being questioned by the scientific community.  Counsel relied in part on the February 2009 NRC report.  The report criticized the foundation of firearm and toolmark identification for several reasons, including that the current process resulted in a subjective decision; there was no statistical foundation for estimation of error rates; firearms analysis lacked a precisely defined process and specific protocol; and more research was needed to determine the degree to which firearms-related toolmarks are unique.

At the hearing counsel argued that the NRC report marked a change in scientific opinion such that a "prong one" *Kelly* hearing was warranted.  The trial court declined, stating that there was not sufficient evidence that the scientific community had called into question the techniques currently used.  Thereafter the court found that Smith qualified as an expert and he performed the examinations and tests in compliance with the San Francisco Police Department protocol, the Association of Firearm and Toolmark Examiners and the protocols of Illinois and Florida.  On the issue of the scope of permissible testimony, the court ruled that Smith "can't say that it's 100 percent; there is no other gun in this world. It's just his opinion."

Smith did testify, over objection, that the chance of another weapon creating the same pattern was so remote as to be "practically impossible."  The court instructed the jury that "this is his opinion.  He can only talk about how he is.  I want it to be understood that he did not test fire every Glock pistol in the world or in this country or this state.  So when he talks about this, this is his opinion as to his certainty."  Smith went on to state that the comparisons were "textbook."  And later, "[M]y identification is of a practical certainty based off of my training and experience."

At the close of trial, the unsuccessful new trial defense motion included argument that the trial court should have granted the "prong one" *Kelly* hearing and the form of Smith's testimony was improper.

**Legal Framework**

Our Supreme Court has laid down three requirements governing admission of evidence generated by a new scientific technique.  First, the reliability of the new technique must be sufficiently established to have gained general acceptance in the relevant scientific field.  Thus, when faced with a new method of proof, courts will require a preliminary showing of general acceptance in the relevant scientific community.  (*Kelly*, 17 Cal. 3d at 30.)  Second, the witness testifying to the reliability of the technique must be properly qualified as an expert on that subject.  And third, the evidence must show that correct scientific procedures were followed.  (*Ibid.*)

The *Kelly* court further explained that once a published appellate decision has affirmed admission of evidence based on a new scientific technique, that precedent will control subsequent trials, "at least until new evidence is presented reflecting a change in the attitude of the scientific community."  (*Kelly*, 17 Cal. 3d at 32.)  In other words, the precedent controls "in the absence of evidence that the prevailing scientific opinion has materially changed."  (*People v. Venegas* (1998) 18 Cal. 4th 47, 53.)  We independently review the decision to deny a *Kelly* hearing. (*See id*. at 5.)

However, it is important to underscore that Kelly only applies to "that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law." (*People v. Cowan* (2010) 50 Cal. 4th 401, 470.) . . .

(Ex. 7 at 16-18.)

## 2. Federal Authority

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is possible to have a fair trial even when state standards are violated.  *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal*, 926 F.2d at 920.  Furthermore, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under

15

Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

### 3. Analysis

The Court of Appeal denied this claim based on its conclusion that Smith did not use any "new" techniques to reach his conclusion such that a hearing under *Kelly* was warranted. This determination was not objectively unreasonable. First, as pointed out by the Court of Appeal, expert evidence on toolmark and firearm identification evidence is universally admissible. *See* Ex. 7 at 18 (citing 4 David Faigman et al., *Modern Scientific Evidence, The Law and Science of Expert Testimony* § 35:1, pages 613-14 (Thomason Reuters/West 2010) (*Faigman*)). Expert testimony identifying a particular weapon as the same source of a questioned crime scene bullet and known bullets from test firings is admissible in every American jurisdiction. *Id.* at 18-19 (citing *Faigman* at § 35:3, p. 619). Although, in some cases, courts are beginning to apply closer scrutiny to the techniques used in this type of forensic identification, they have generally found toolmark and firearm identification evidence to be sufficiently reliable. *See e.g.*, *United States v. Glynn*, 578 F. Supp. 2d 567, 571, 574 (S.D.N.Y 2008) (although ballistics opinions may be subjective and vague, the basic assumptions of ballistics identification are valid and "its methodology has garnered sufficient empirical support as to warrant its admissibility"); *United States v. Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006) (community of toolmark examiners united in its acceptance of current scientific technique and "the methodology of firearms identification is sufficiently reliable" even though improvements have been suggested); *United States v. Diaz*, 2007 WL 485967, *1 (N.D. Cal. 2007) (after a four-day evidentiary hearing, district court found the "theory of firearm identification used by the San Francisco Police Department Crime Lab is reliable . . . while there is some subjectivity involved, it is the subjective judgment of trained professionals with a keen practiced eye for discerning the extent of matching patterns.").

Furthermore, Smith's expert testimony that there was a match between the test-fired casings and the casings found at the crime scenes was highly relevant to show that

16

1  Melcher, who owned and possessed the gun from the test-fired shots, was the shooter in

2  both the San Bruno and Japantown incidents.

3      Based on the foregoing, Melcher has failed to show that the admission of Smith's

4  testimony without conducting a foundational *Kelly* prong-one hearing, constituted a

5  violation of his due process rights.  Furthermore, because no clearly established Supreme

6  Court authority holds that the failure to hold such an evidentiary ruling constitutes a due

7  process violation, the Court of Appeal's denial of this claim was not contrary to or an

8  unreasonable application of clearly established federal law.

9      Therefore, this claim does not warrant habeas relief.

10  **B. Form of Expert's Testimony**

11      **1. Court of Appeal Opinion**

12  Appellant also complains that the form of Smith's testimony . . . violated his due
   process rights.  He protests that in expressing his opinion, Smith should not have
13  used the phrases "practical certainty," or the "impossibility of another source."

14  Ruling on the motion to exclude firearm and toolmark identification evidence, the
   trial court stated that Smith could testify "[i]n my opinion I am certain that this is
15  the same thing," but "no hundred percent."  Smith did go on to opine, over
   objection, that the "chances of another firearm creating [the] exact same pattern are
16  so remote to be considered practically impossible."  The court admonished the jury
   that this was Smith's opinion, and made it clear that he did not test fire every Glock
17  in the world, state or city.  Smith went on to say that the comparison he
   demonstrated were "textbook"—"very good examples" of what firearm
18  identification should look like.  Later he explained that his identification was "of a
   practical certainty" based on training and experience, but that his opinion was not
19  "absolute to the exclusion of all the other firearms."

20  . . .

21  [T]he federal courts vary on the proper form of testimony, based on varying degrees
   of concern about the reliability of the methodology.  The *Monteiro* court explained
22  that a qualified expert could testify to a match "to a reasonable degree of ballistic
   certainty." (*U.S. v. Monteiro*, 407 F. Supp. 2d at 372.)  The *Green* court would not
23  allow testimony "to the exclusion of every other firearm in the world" or a
   conclusion that there was a definitive match.  (*U.S. v. Green*, (D. Mass 2005) 405 F
24  .Supp. 2d 104, 109.)  The *Glynn* court limited the opinion that a match was "more
   likely than not. . . ." (*U.S. v. Glynn*, 578 F. Supp. 2d at 574–575.)  And finally, the
25  *Diaz* court forbade a conclusion "to the exclusion of all other firearms in the world"
   but permitted testimony that a casing was fired from a certain firearm to a
26  "reasonable degree of certainty in the ballistics field."  (*Diaz*, at *14.)

27  Smith did not express a conclusion to the "absolute exclusion" of all other firearms,
   and did not express 100 percent certainty.  He came very close to the line with the
28  "practical certainty" and "so remote to be considered practically impossible"

17

United States District Court
Northern District of California

language. The trial court tempered the testimony somewhat with its admonition. Later instructions on how to evaluate expert testimony, including that the jurors must decide "whether information on which the expert relied was true and accurate," and can disregard an opinion they find unbelievable, unreasonable or not supported by the evidence, further enforced the court's admonition. In addition, the expert was tested by cross-examination, and appellant had the right to put on his own expert, but declined.

Assuming, for purposes of argument only, that the form of Smith's testimony should have been reigned in to comply with that of *Diaz* or *Glynn*, no prejudice stemmed from the form he did use. For all the reasons set forth above, the difference between "practical certainty" and "considered practically impossible" versus "reasonable degree of certainty" or "more likely than not" would not tip the outcome in this case. And, for the same reasons, the form of testimony did not render appellant's trial arbitrary or fundamentally unfair. (*See Estelle v. McGuire* (1991) 502 U.S. 62, 70.)

(Ex. 7 at 21-23.)

### 2. Analysis

As mentioned previously, on habeas review, the question is whether the admission of challenged evidence was so prejudicial in the context of the trial proceedings as to render the petitioner's conviction unfair. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Walters*, 45 F.3d at 1357. Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at 920.

The Court of Appeal's conclusion that Smith's testimony did not go outside the bounds of proper testimony proposed by federal courts was not objectively unreasonable. Federal courts have stated that a qualified expert may testify to a match, "to a reasonable degree of ballistic certainty," or that a match was "more likely than not." *See Monteiro*, 407 F. Supp. 2d at 372; *Glynn*, 578 F. Supp. 2d at 574-75. Smith explained that his opinion that the gun recovered from Melcher fired the casings at the Japantown and San Bruno shootings was not "absolute to the exclusion of all firearms." (16 Reporters Transcript ("RT") 1419.) He stated that the only way for him to reach such an absolute conclusion would be to test every firearm that existed and that this was obviously not possible. (*Id.*) Smith was also subjected to cross-examination by defense counsel. (16 RT 1420-85.)

Even if the trial court had erred by admitting Smith's testimony, the Court of Appeal's finding of no prejudice was not objectively unreasonable. As discussed

previously, the evidence against Melcher for both shootings was strong.  Given this strong

evidence, the difference between Smith's opinion expressing "practical certainty" and

"considered practically impossible," versus the more correct statement of "reasonable

degree of certainty" or "more likely than not," would not have changed the outcome of the

verdict.  In addition, when Smith's opinion came close to the line of 100 percent certainty,

the trial court admonished the jury that Smith did not fire every Glock gun in the world to

reach his opinion and, thus, his opinion could not exclude all other Glock guns.  (16 RT

1386.)  The trial court also instructed the jury as to how to evaluate expert testimony.  (21

RT 2200-01.)  The trial court's admonishments and instructions alleviated any danger of

prejudice.  *See CSX Transp., Inc.*, 556 U.S. at 840 (without any evidence to the contrary, it

is presumed jury will follow court's admonitions and instructions).

Based on the foregoing, the Court of Appeal's denial of this claim was not contrary

to or an unreasonable application of Supreme Court authority.  This claim is denied.

### III. Admission of Uncharged Conduct Evidence

Melcher argues that the trial court violated his right to a fair trial by admitting

prejudicial evidence that the rotten.com website had been accessed on his computer

numerous times.  Rotten.com contains images of murder and death, photographs of Asians

in masks, sexual cartoons of Asian women, an image of an Asian woman sliced like sushi,

images depicting racial bigotry against African-Americans and other such images.

### A. Background

The Court of Appeal summarized the background to this claim as follows.

During a lengthy pretrial hearing, Officer Lynch testified about the forensic
investigation of Internet links and Web sites accessed on appellant's computer,
notably his 20 visits to the rotten.com Web site during the period September 5, 2006
through October 14, 2006.  The trial court admitted the Internet links and images
accessed on appellant's computer between August and October 2006 from the
rotten .com Web site.  It ruled that the evidence was relevant to prove motive,
intent, premeditation, deliberation, and appellant's fixation on Asians, death and
homicides.  It explicitly found that the prejudicial value of the evidence was
outweighed by its probative value.  However, the court excluded evidence
pertaining to African–Americans, finding such evidence more tenuous and more
prejudicial than probative. . . . .

At trial, Officer Lynch described the rotten.com Web site and the type of images

appellant accessed.  Two exhibits were passed among the jurors, one with the sushi picture and the other with images of Asians with protective masks, Asian military images, and sexually explicit cartoons of Asian women.  On cross-examination, appellant admitting going to the rotten.com Web site several times, and acknowledged the nature of images depicted at the site.

(Ex. 7 at 23-24).

### B. Analysis

The Court of Appeal concluded that there was no due process violation because the evidence was probative of contested issues and its probative value was not outweighed by the danger of undue prejudice.  (Ex. 7 at 26-28).

As indicated above, on habeas review, the question is whether the admission of challenged evidence was so prejudicial in the context of the trial proceedings as to render the petitioner's conviction unfair.  *Estelle*, 502 U.S. at 67; *Walters*, 45 F.3d at 1357.  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *Jammal*, 926 F.2d at 920.  Federal habeas courts have consistently upheld the admission of evidence to prove a specific issue in dispute such as intent, motive, identity, or a common plan or scheme.  *See*, *e.g.*, *Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir. 2006) (identity and intent); *Boyde v. Brown*, 404 F.3d 1159, 1172-73 (9th Cir. 2005) (common plan or scheme); and *Windham v. Merkle*, 163 F.3d 1092, 1103-04 (9th Cir. 1998) (motive).

Based on the above authority, admission of the rotten.com evidence was not improper because there were many permissible inferences the jury could draw from it.  For instance, the website, which focused on Asians, was relevant to prove motive  because the record showed that all of the victims were randomly-selected Asians who Melcher killed or attempted to kill in neighborhoods where many Asian businesses were located.  The rotton.com evidence also tended to show the hate-murder special circumstances that were charged.  The evidence also tended to prove that Melcher had planned and deliberated on the charged crimes because Melcher's viewing of the death images and unflattering images of Asians indicated that he considered his choice to kill and decided to kill Asians.  It is significant that the trial court excluded other evidence from rotton.com which was less

United States District Court
Northern District of California

20

1    relevant to the case, such as the images of African-Americans.  Furthermore, the fact that

2    the jurors rejected the allegation that the crimes were committed on the basis of race shows

3    that, although they saw the rotton.com evidence, it did not unduly prejudice them in

4    finding that Melcher had animus or hatred toward Asians.

5          Melcher cites many Ninth Circuit cases holding that the admission of inflammatory

6    evidence violated the petitioner's due process rights to a fair trial.  However, these cases

7    are distinguishable.  In *Alberni v. McDaniel*, 458 F.3d 860, 865-66 (9th Cir. 2006),

8    although the Ninth Circuit acknowledged that it was possible that the introduction of

9    propensity evidence could violate due process, it held that, in the case at issue, the state

10   court's determination that due process was not violated was not objectively unreasonable.

11         In *Parle v. Runnels*, 505 F.3d 922, 927-34 (9th Cir. 2007), relying on Supreme

12   Court precedent that the combined effect of multiple trial court errors violates due process

13   where it renders the trial fundamentally unfair, the Ninth Circuit held that the many trial

14   court errors pertaining to evidence relevant to the only issue before the jury, the

15   defendant's state of mind at the time of the crime, rendered the petitioner's defense far less

16   persuasive that it might have been, resulting in a substantial and injurious effect or

17   influence on the jury's verdict.  The Ninth Circuit also found that the prosecutor's case

18   establishing the defendant's premeditation was "less than overwhelming, and the jury's

19   verdict is therefore more likely to have been affected by the trial court's errors."  *Id.* at

20   934.  As discussed previously, the prosecutor's case against Melcher was strong.

21   Furthermore, in Melcher's case, no other trial court errors can be added to the effect of the

22   admission of the rotten.com evidence so there is no cumulative effect of many errors as

23   there was in *Parle*.  Also, unlike in *Parle* where the Ninth Circuit relied on Supreme Court

24   precedent regarding the effect of cumulative errors to grant the petition, here, no Supreme

25   Court precedent holds that the "admission of irrelevant or overtly prejudicial evidence

26   constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley*, 568

27   F.3d at 1101.

28         Based on the above, the state court's denial of this claim was not contrary to or an

United States District Court
Northern District of California

21

1    unreasonable application of Supreme Court authority or an unreasonable determination of

2    the facts in light of the record in the state court proceeding.

3    **IV. Evidence that Firearms Evidence Had Been Given to Defense Expert**

4         Melcher argues that the trial court's decision to admit evidence that the firearms

5    evidence had been given to a defense expert, and the prosecutor's comment about it,

6    violated his due process rights to a fair trial and to confidential expert assistance.

7         **A. Background**

8         The Court of Appeal summarized the relevant facts of this claim as follows:

9         At trial defense counsel moved to preclude [evidence that firearms evidence had
10        been given to a defense expert], raising concern that the prosecutor could argue that
          the defense conducted tests and if they came "back negative[,] you would have
          heard from a defense expert."  The prosecutor represented that there was "no way"
11        he would make that argument and further pointed out that because the People's
          expert had undergone significant cross-examination about "his practice, his field
12        and the reliability of it," as a matter of fairness the jury should know that the
          evidence was turned over to the defense.  The court concurred, remarking that since
13        the cross-examination raised issues of how the expert performed the test, the jurors
          reasonably could deduce that "this is in the hands of the D.A. and that the defense
14        could not have equal access."  The court permitted the prosecutor to read a
          stipulation that a police inspector released ballistics evidence to the defense expert,
15        and indicated it was holding the prosecutor to his representation.

16        Later in the course of trial, the prosecutor read the stipulation to the jury.  And
          during closing argument he stated, "Did you know that the ballistics was turned
17        over to the defense? There was a stipulation."  On rebuttal he said, "There was no
          . . . one to confront  . . . Mr. Smith's position. . . . Mr. Smith testified, subject to
18        human error.  Ballistics was turned over to defense."

19    (Ex. 7 at 28).

20        **B. Analysis**

21        The Court of Appeal denied the claim regarding Melcher's inability to

22    confidentially communicate with his expert because no confidential information was

23    revealed.  (Ex. 7 at 28-29).  The court also concluded that the admission of the challenged

24    evidence was proper because defense counsel had opened the door to such evidence and

25    argument by attacking the procedures the prosecution's ballistics expert used to test and

26    evaluate the firearms evidence.  (Ex. 7 at 29).

27        Although Supreme Court precedent has established that the Sixth Amendment

28    guarantees, in all criminal prosecutions, the effective assistance of counsel, *see* G*ideon v.*

United States District Court
Northern District of California

*Wainwright*, 372 U.S. 335, 339 (1963), and an indigent defendant is entitled to compensated ancillary services such as an expert, *see Ake v. Oklahoma*, 470 U.S. 68, 76-77 (1985), no Supreme Court precedent holds that a defendant has a constitutional right to communicate with his expert in confidence.  For this reason alone, Melcher's claim that he was denied his right to communicate in confidence with his ballistics expert must be denied.  However, even if there were such an established right, it would not have been violated because the stipulation that was read to the jury did not reveal any confidential information that Melcher may have obtained from his ballistics expert; it merely stated that the ballistics evidence had been given to the defense expert.

Furthermore, admission of the stipulation did not violate Melcher's due process rights to a fair trial because it was relevant to rehabilitate the testimony of the prosecution's ballistic expert, which defense counsel had attacked on cross-examination. The stipulation showed that the same ballistics evidence had been given to the defense expert.  Without the stipulation, the jury could have believed that the ballistics evidence had been withheld from the defense and, thus, could have been left with doubt about the reliability of Smith's procedures.

In regard to the prosecutor's comment about the stipulation, Melcher argues that it was sufficient for the prosecutor to mention that the ballistics evidence had been turned over to the defense and that there was no need to specify that it had been turned over to the defense expert.  Melcher argues that this was unduly prejudicial because the reference to the defense expert invited the jury to speculate about the expert's inability to obtain contrary results, which created a substantial danger of confusing the issues and misleading the jury.  In his traverse, Melcher clarifies that this is not a claim of prosecutorial misconduct, but a challenge to the trial court's rulings permitting the evidence and comment in the face of defense counsel's objections.  However, as discussed above, the court did not err in admitting the stipulation because it established the permissible inference that Smith's procedures were reliable.  *See Jammal*, 926 F. 2d at 920 (only if there are no permissible inferences that the jury may draw from the evidence can its

23

admission violate due process).  Because the parties stipulated to the fact that the ballistics

evidence had been given to the defense expert, it was permissible for the prosecutor to

mention this to the jury in his closing argument.

Accordingly, the Court of Appeal's denial of this claim was not contrary to or an

unreasonable application of Supreme Court precedent.

**V. Trial Court's Failure to Institute Competency Proceedings**

Melcher claims that the trial court committed constitutional error by failing to

initiate competency proceedings or to conduct further inquiry into his competency.

### A. Background

The Court of Appeals summarized the facts regarding this claim as follows:

> On March 25, 2009, at the request of defense counsel, the trial court conducted an
> in camera inquiry to ensure that appellant understood his right to present mental
> health defenses.  Counsel had provided the court with the report of Dr. Natalie
> Novick Brown and referenced it at the hearing, noting documentation therein of
> fetal alcohol syndrome and an Axis I diagnosis of delusional disorder.  He
> expressed that the case falls "into a gray area" and observed that he struggled at
> length "with the competency issue."  Counsel indicated that all the experts in the
> case except Dr. Brown believed appellant was competent.  Appellant had
> cooperated with and had interviews with a "couple psychiatrists" and three
> psychologists.  However, he refused to pursue mental health defenses, or undergo
> more tests such as an MRI.

> Counsel believed that a mental state defense was more appropriate than an
> identification defense, and wanted to make sure that his client understood the
> various defenses he would be waiving by pursuing the latter.  Counsel indicated that
> a possible mental state defense could focus on the components of intent.  An
> insanity defense could focus on appellant's moral judgment as impeded by specific
> delusional fears.

> The trial court discussed these defenses with appellant, asked probing questions,
> and appellant explained in his own words what the doctors had to say about the
> issues.  Appellant indicated he understood and had considered the mental health
> defenses, but made the choice to waive those defenses and assert an identity
> defense.

(Ex. 7 at 31).

### B. Analysis

The Court of Appeal denied this claim based on its findings that:  defense counsel

did not express a doubt about Melcher's competence; Dr. Brown's report was not current

and she did not specifically state that Melcher was incompetent to stand trial; Melcher had

1    cooperated with counsel and met with five mental health professionals who all concluded

2    that he was competent; and Melcher spoke appropriately to the trial court during the in-

3    camera hearing.  (Ex. 7 at 31-33).

4        A criminal defendant may not be tried unless he is competent.  *Godinez v. Moran*,

5    509 U.S. 389, 396 (1993); *Sully v. Ayers*, 725 F.3d 1057, 1070 (9th Cir. 2013).  The

6    conviction of a defendant while legally incompetent violates due process.  *Cacoperdo v.*

7    *Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).  The test for competence to stand trial is

8    whether the defendant demonstrates the ability "to consult with his lawyer with a

9    reasonable degree of rational understanding" and a "rational as well as factual

10   understanding of the proceedings against him."  *Godinez*, 509 U.S. at 396; *Sully*, 725 F.3d

11   at 1070; *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003).  The question "is not

12   whether mental illness substantially affects a *decision*, but whether a mental disease,

13   disorder or defect substantially affects the prisoner's *capacity* to appreciate his options and

14   make a rational choice."  *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004) (emphasis in

15   original); *Deere v. Cullen*, 718 F.3d 1124, 1146-47 (9th Cir. 2013).

16       Due process requires a trial court to order a psychiatric evaluation or conduct a

17   competency hearing sua sponte if the evidence raises a bona fide doubt about the

18   defendant's competence.  *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *United States v.*

19   *Dreyer*, 705 F.3d 951, 967 (9th Cir. 2013).  A good faith doubt about a defendant's

20   competence arises if "'a reasonable judge, situated as was the trial court judge whose

21   failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt

22   with respect to competency to stand trial.'"  *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir.

23   2010).  In ascertaining a defendant's competence, factors to be considered are evidence of

24   the defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on

25   his competence.  *Mendez v. Knowles*, 556 F.3d 757, 771 (9th Cir. 2009).  Although the

26   opinion of trial counsel is not determinative on the issue of his client's competency,

27   counsel is in the best position to evaluate his client's comprehension of the proceedings.

28   *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991).  On habeas review, the state court's

United States District Court
Northern District of California

25

determination that the evidence did not require a competency hearing is a factual

determination to which a federal habeas court must defer unless it is objectively

unreasonable under 28 U.S.C. § 2254(d)(2).  *Id.*; *Davis v. Woodford*, 384 F.3d 628, 644

(9th Cir. 2004).

The Court of Appeal's denial of this claim was not objectively unreasonable.  Given

the evidence that supported Melcher's competence at the time of the March 25, 2009 in-

camera hearing, the trial court's determination that no further competency hearing was

necessary was supported by the factors listed in *Mendez*.  First, there was no evidence

before the court that Melcher was behaving irrationally.  To the contrary, the court

observed first-hand Melcher's demeanor at the in-camera hearing, which was proper and

thoughtful.  10 RT 561-66 (transcript of in camera hearing).  The court engaged in a direct

colloquy with Melcher, who answered all of the court's questions appropriately and

respectfully.  *Id.*  At one point, the court asked Melcher to summarize what the examining

mental health professionals had told him about his defense.  Melcher summarized the

situation accurately and ended by stating that, even though he knew the severity of his

situation and that a mental health defense could help him, he chose to waive that defense

and challenge the district attorney's evidence directly.  10 RT 565-66.

Second, the court considered Dr. Brown's report.  A summary of her opinion

appears at the beginning of the report, as follows:

> (1) Melcher suffers from Delusional Disorder, primarily Persecutory Type, which in his case is a chronic psychotic condition that impairs his ability to interpret events accurately and causes him to engage in irrational behaviors due to his faulty belief system;
>
> (2) His history contains sufficient evidence of cognitive-behavioral symptoms to meet the functional diagnostic criterion for Fetal Alcohol Syndrome.
>
> (3) His cognitive-behavioral deficits involve life-long impairments in his executive functioning . . . which have been a consistent factor in his rule-breaking and antisocial conduct throughout his life.
>
> (4) A mental defect such as FAS would *compound* the irrational aspects of his Delusional Disorder, thereby exacerbating the severity of symptoms in the latter.

Clerk's Transcript ("CT") 1731 (emphasis in original).

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1        Although Dr. Brown diagnosed Melcher with Delusional Disorder, Persecutory

2    Type, which impaired his ability to interpret events accurately and caused him to engage in

3    irrational behaviors due to a faulty belief system, she did not opine that he was

4    incompetent to stand trial, as defense counsel represented to the court.  A determination of

5    Melcher's competency required Dr. Brown to make a finding about Melcher's ability to

6    understand the proceedings against him and his capacity to appreciate his situation and to

7    make rational choices.  This determination was not addressed by Dr. Brown.

8        Third, although defense counsel told the court that he had "struggled with the

9    competency issue," he did not indicate that he currently had a doubt about Melcher's

10   competence.  10 RT 558.  The reason counsel asked the court for the hearing was to deal

11   with the fact that Melcher was waiving a mental state defense, not that he was incompetent

12   to stand trial to assert such a defense.  *Id.*  Furthermore, the record shows that Melcher was

13   cooperating with his attorney—Melcher agreed to meet with several mental health

14   professionals at his counsel's urging.

15       Under these circumstances, a reasonable judge, situated as was the trial court judge,

16   would not have experienced doubt with respect to Melcher's competency to stand trial.

17       Nevertheless, Melcher argues that Dr. Brown's report alone provides substantial

18   evidence of his incompetence and this demanded further competency proceedings.  *See*

19   Traverse at 6S.  However, as indicated above, in her report, Dr. Brown does not indicate

20   that Melcher was incompetent and Melcher fails to point to any part of her report where

21   she does so.  Melcher relies on the fact that Dr. Brown "lamented that appellant's

22   delusional process was causing his resistance to any mental health inquiries."  This issue

23   was considered by the court at the in-camera hearing, but based upon case law holding that

24   a defendant is the master of his case, the court could not impose a defense upon Melcher

25   that he did not wish to pursue or order testing that he did not wish to undergo.  10 RT 568.

26   *See e.g. North Carolina v. Alford*, 400 U.S. 25, 38-39 (1970) (due process does not require

27   court to reject voluntary and intelligent plea of guilty even though defendant asserted his

28   innocence); *Frendak v. United States*, 408 A.2d 364, 376 (App. D.C. 1979) (holding that,

1   if defendant acted intelligently and voluntarily, trial court must defer to defendant's

2   decision to waive the insanity defense); *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970)

3   (Brennan, J. concurring) (defendant, by persisting in reprehensible conduct, surrendered

4   his right to be present at trial, and this decision must be honored).  In *Frendak*, the court

5   provided compelling reasons for a defendant's decision to forego an insanity defense, even

6   if substantial evidence supported it.  *Frendak*, 408 A.2d at 376-78.

7       Based on this record, the Court of Appeal's denial of this claim was not objectively

8   unreasonable.  *See Davis*, 384 F.3d at 644 (on habeas review, the state court's

9   determination that evidence did not require a competency hearing is a factual

10  determination to which a federal habeas court must defer unless it is objectively

11  unreasonable).  Accordingly, habeas relief on this claim is denied.

12  **VI. Waiver of Insanity Plea**

13      Melcher claims the trial court violated his due process rights by permitting him to

14  waive an insanity plea and related defenses without conducting an adequate inquiry.

15  Specifically, he claims that the trial court should have, at a minimum, asked him why he

16  was refusing the insanity defense and further mental health examinations.

17      **A. Background**

18      The Court of Appeal summarized the relevant facts as follows.

19      To recap, at the in camera hearing defense counsel expressed his belief that a
20  mental health defense—either an insanity plea or an attack on intent—was more
    appropriate than an identification defense.  He noted that all the experts basically
21  agreed with the diagnoses of fetal alcohol syndrome and delusional disorder.
    According to counsel, all but Dr. Brown believed he was competent.  Counsel
22  understood that it was his client's decision whether or not to waive an insanity plea,
    but he wanted to ensure that appellant adequately understood and considered the
23  defenses and waiver thereof.

24      The court explained that the purpose of the hearing was to make sure appellant
    understood the consequences of his decisions.  The court asked if he heard and
25  understood the statements made by his attorney at the hearing; and stated it had
    reviewed Dr. Brown's report, including the possibility that he suffered fetal alcohol
26  syndrome and that Dr. Brown wanted to explore further tests, as the syndrome
    could be a defense.  The court also probed exploring a mental defense that would
27  negate premeditation and deliberation, an avenue his attorney wanted to pursue,
    which could be a strong defense to the charges, and observed that his preferred
    defense of identity may not be as strong.  Additionally, the court explained that with
28  the insanity plea, appellant would have to submit to an examination that might

United States District Court
Northern District of California

28

United States District Court
Northern District of California

explain certain conduct.  To all these questions and probes, appellant indicated that he understood.  As well, the court inquired if appellant chose not to explore mental health defenses; appellant said he chose not to.  He understood the possibility that these may be stronger defenses.  Responding to further questions, appellant related what his attorney and the doctors had said about the tests and diagnoses, and how they might help him in the case.  He understood the reason they talked with him was to find out if he were competent enough to be aware of the severity of his situation.  Stating that he was "completely aware" of that, his own choice was to waive the defense; he wanted to beat the case based on the facts.  Further, both appellant and counsel stated they had discussed the insanity defense in detail.

The court ruled that appellant had made an intelligent and voluntary decision to forego the insanity defense and any other mental health defenses, and advised appellant if he wanted to revisit the matter, to let the court know.

(Ex. 7 at 34-35).

**B. Analysis**

The Court of Appeal denied this claim based on California law which held that a court may not compel a defendant to present an insanity defense so long as it is satisfied that the waiver of the defense is a free and voluntary choice with comprehension of the consequences.  (Ex. 7 at 35).  In reviewing the transcript of the in camera hearing, the Court of Appeal held that the trial court had asked sufficient questions to ascertain from Melcher's responses that his waiver of the insanity plea was knowing and voluntary.  (Ex. 7 at 35-36).

Federal law requires that a defendant's entry of a guilty plea must be knowing, voluntary and intelligent.  *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).  However, federal law has not addressed the inquiry a trial court must make when a defendant decides to waive or withdraw an insanity or related defense.  *See Florida v. Nixon*, 543 U.S. 175, 187 (2004)  (only decisions requiring defendant's consent are whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal).  In *Weber v. Israel*, the Seventh Circuit held that the petitioner's silence when his counsel announced that the petitioner had decided to withdraw his plea of not guilty by reason of insanity was sufficient to constitute a waiver of the defense.  730 F.2d 499, 506-07 (7th Cir. 1984).  The court held that there were no requirements that the waiver be knowing and intelligent as in the acceptance of a guilty plea because the petitioner was not being deprived of his constitutional rights against self-incrimination, to a jury trial or to confront his accusers.  *Id.* at 507; *see also*

1    *United States v. Robertson*, 430 F. Supp. 444, 447 n.4 (D.D.C. 1977) (defendant who is

2    competent and whose decision is made rationally and with an awareness of its

3    consequences should be allowed to proceed to trial without an insanity defense, even

4    though there may be evidence which could support such a defense).

5           Because no Supreme Court authority addresses the type of inquiry that a trial court

6    must make in accepting a defendant's waiver of an insanity defense, the Court of Appeal's

7    denial of this claim was not contrary to or an unreasonable application of established

8    federal authority.  And, even if the trial court was constitutionally required to ascertain that

9    Melcher's waiver was knowing, voluntary and intelligent, this standard was met.

10          As summarized by the Court of Appeal, at the in camera hearing, after counsel

11   voiced his concern that Melcher was waiving a strong insanity defense, the trial court

12   asked Melcher many questions about his knowledge of the seriousness of the murder

13   charges against him and the strength of a mental health defense, including insanity.  10 RT

14   559, 561-67.  Melcher responded to the trial court's questions coherently and

15   appropriately.  *Id.*  At one point, the court made a comment that Melcher did not

16   understand and Melcher asked what it meant.  10 RT 567.  The trial court apologized for

17   using language that Melcher might not have understood and rephrased the question so that

18   Melcher understood it.  *Id.*  The court also informed Melcher that if he ever did not

19   understand something, he was welcome to ask for an explanation.  *Id.*  This shows that, if

20   Melcher did not understand a question or issue, he was not reticent to ask for clarification.

21   Melcher did not ask again for clarification.  Because Melcher's responses indicated that he

22   understood everything discussed by the court, including the viability of the insanity

23   defense, there was no reason for the court to probe further and ask why he was refusing to

24   assert such a defense.  As mentioned above, in *Frendak*, 408 A.2d at 376-78, the court

25   discussed many cogent reasons a defendant might want to reject an insanity defense.

26          Furthermore, defense counsel told the court that he had been representing Melcher

27   for approximately one year and, during that time, he and Melcher had met and had

28   discussed in detail the potential mental health defenses.  10 RT 557.  Melcher agreed that

United States District Court
Northern District of California

30

1    he had thoroughly discussed mental health defenses with counsel.  10 RT 566.

2         Under these circumstances, the trial court's determination that Melcher's waiver of

3    any mental health defense, including insanity, was knowing, intelligent and voluntary was

4    not objectively unreasonable.

5         As discussed above, there was no need for the trial court to make further inquiries

6    about Melcher's competence because a reasonable judge, witnessing Melcher's conduct at

7    the in camera hearing, would not doubt his competence.

8         Accordingly, the Court of Appeal's denial of this claim was not contrary to or an

9    unreasonable application of established federal authority or an unreasonable determination

10   of the facts in light of the state court record.  This claim does not warrant habeas relief.

11   **VII. Cumulative Prejudicial Effect**

12        Melcher argues that the cumulative prejudicial effect of his claimed constitutional

13   errors violated his due process rights.

14        In some cases, although no single trial error is sufficiently prejudicial to warrant

15   reversal, the cumulative effect of several errors may still prejudice a defendant so much

16   that his conviction must be overturned.  *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th

17   Cir. 2003).  Where, as in this case, there is no single constitutional error existing, nothing

18   can accumulate to the level of a constitutional violation.  *Mancuso v. Olivarez*, 292 F.3d

19   939, 957 (9th Cir. 2002).  Accordingly, the Court of Appeal's denial of this claim was not

20   contrary to or an unreasonable application of established federal authority.  This claim is

21   denied.

22                                    **CONCLUSION**

23        The state court's adjudication of Melcher's claims did not result in decisions that

24   were contrary to, or involved an unreasonable application of, clearly established federal

25   law, nor did they result in decisions that were based on an unreasonable determination of

26   the facts in light of the evidence presented in the state court proceeding.  Accordingly, the

27   petition is DENIED.

28        A certificate of appealability will not issue.  Reasonable jurists would not "find the

31

district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:**  January 3, 2013

WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California